PASCUAL MÁRQUEZ ET AL., Plaintiffs and Appellants, *v.* PUERTO RICO TELEPHONE CO., Defendant and Appellee.

No. 92.      Decided May 20, 1963.

*Guillermo Bauzá* for plaintiffs. *Rivera Zayas, Rivera Cestero & Rúa,* and *Antonio Montalvo Nazario* for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Plaintiffs claimed damages from Puerto Rico Telephone Co. as a result of an automobile accident which occurred in the evening of May 25, 1957 at Km. 79, Hm. 7, highway No. 3, while the vehicle was traveling from Humacao to Playa de Humacao. It was alleged in the complaint that at that place the driver suddenly came in contact with a tension wire lying across the road where the vehicle became entangled, he lost control and the automobile plunged down a cliff with its occupants. It was also alleged that when the accident occurred defendant had exclusive ownership and control of the tension wire and of the pole which were lying at that place, and that the pole was decayed and broken near the base.

The case having been heard on the merits, the San Juan Part of the Superior Court rendered opinion and judgment dismissing the complaint. The trial court made the following statement of facts:

"1. On May 25, 1957, late in the evening, plaintiff Pascual Márquez was driving his Chevrolet automobile along the road from Humacao to Humacao Playa. As he reached a certain place in the road in a bend or curve, the driver ran into a wire which was lying across the road. Thereupon he attempted to swerve to the left, but the wire became entangled in the vehicle in such a way that the driver lost control, the vehicle swerved to the right and plunged down a cliff with the consequences described hereinbelow.

". . . . . . . ."

[Conclusions follow on damages suffered by occupants.]

"4. The wire referred to in paragraph 1 *supra* is a tension wire which supported a pole on the right-hand side of the road, in the direction of Humacao-Humacao Playa, another pole was on the other side of the road which was used to support telephone wires or lines under the control of defendant Porto Rico Telephone Company. After the occurrence of the accident the supporting pole or anchor of the tension wire on the right-hand side of the road was broken at the lower end so that the upper end, holding the tension wire, was lying on the edge of the

road. The supporting pole was quite new, was creosoted and in good condition.

"5. The evidence fails to show the cause of the breaking of the supporting pole of the wire, or the time when such breaking occurred. The evidence does show that between half past nine and ten o'clock in the evening of the accident the road was clear and that the tension wire did not obstruct the road. The accident occurred before eleven o'clock in the evening. There is nothing in the evidence to show that any defective condition of the poles or of the tension wire, necessarily occurring after half past nine or ten o'clock in the evening, was reported to or known by defendant at all."

On the basis of these facts the court made the following conclusions of law:

"1. The evidence, as summed up, fails to show any specific negligence on the part of defendant Porto Rico Telephone Company. The fact alone of the breaking of the supporting pole of the tension wire and consequent fall on the road is not evidence of defendant's negligence in the absence of proof of (a) defective condition of the telephone lines in the locality, specifically, of the supporting pole and/or tension wire; (b) lack of due inspection of the telephone lines; and (c) defendant's knowledge of the breaking of the pole and fall of the tension wire the night of the accident sufficiently in advance to remedy the situation.

"2. On the other hand, the evidence in the case does not lead to an inference of negligence on the part of defendant under the *res ipsa loquitur* rule. [Citations.]

"3. The evidence having failed to show, either directly or by reasonable inference, negligence on the part of defendant as cause of the accident described and consequential damages to plaintiffs, the action should be dismissed in its entirety."

There was evidence of both parties on the condition of the fallen pole. Police Sergeant Emilio Moryet, who conducted an immediate investigation at the scene of the occurrence, testified upon questioning by plaintiffs:

"Q. Could you inform the court whether you examined the fallen portion and the standing portion?
A. Yes, I examined it.

Q. Tell the judge whether you noticed, in connection with the texture of the wood, anything which attracted your attention.

.    .    .    .    .    .    .    .

A. It did not look very decayed nor in very good condition.

Q. When you say not very decayed, what do you mean to say?

A. That the condition was fair as compared with the condition of the weather.

Q. Did you examine the wood closely?

A. Yes, sir.

Q. Do you know what rotten wood is?

A. Yes, sir.

Q. On that point, will you describe the pole according to the examination which you made.

HON. JUDGE:

He just testified that it was decayed.

WITNESS:

It was not in an advanced state of decay, but it was slightly decayed.

ATTORNEY RÚA:

Objection.

HON. JUDGE:

That is a question which a person may say whether or not it was decayed or looked old; no expert is necessary to say so. You may testify.

ATTORNEY BAUZÁ:

Q. Did you inspect the vehicle?

A. Yes, sir.

.    .    .    .    .    .    .    ."

Upon questioning by defendant:

"Q. Is the base of the pole Exh. 6(c) and 6(d)?

A. Yes, sir.

Q. Did you examine it that night with the flashlight and take a look at it, as you said yesterday afternoon— you may change it if you wish—neither too decayed nor too good?

A. The part on the surface.

Q. What part, showing you exhibit 6(d), point out the part to which you refer.

A. On the circumference around the pole I found a decayed part, but the inside wood was in pretty good condition.

Q. What color was the decayed part?

A. It was blackish.

Q. Was it blackish on the outside?

A. Between the surface and the inside there was a part which looked blackish.

Q. If this pencil were the pole, did it look blackish and rotten on the outside?

A. To a certain depth of the pole in the center, like a peg with a certain diameter it was all right.

Q. What diameter would that be? Is the pole this wide?

A. Quite wide.

Q. In the center, inside, the part which looked quite well, what was the diameter?

A. Two or three inches toward the center.

HON. JUDGE:

Q. The part of the interior wood which you say was in good condition, what was the diameter of that part?

A. Five or six inches.

.        .        .        .        .        .        .        ."

Upon questioning by plaintiffs:

"Q. When you described the pole as you illustrated it to the distinguished colleague, in breaking this pencil as if it were the pole, you say that several inches of wood inside was apparently in good condition?

A. Yes, sir.

Q. How was the wood outside?

A. It was decayed, in shreds.

Q. Could you tell if you saw anything else without reaching conclusions, describing the interior part, when you say it was in shreds, what do you mean to say?

A. That it was quite decayed."

Witness Gregorio González Ortiz, who said that he lives 25 meters from the place and that he had been called to assist, testified:

"Q. The night of the accident, during the time you helped place the pole in that position, did you examine the pole?

A. Yes, sir.

Q. Will you describe the condition of the pole.

A. The pole apparently was decayed, the bark on the outside.

Q. Did you touch the pole?

A. Yes, sir.

.    .    .    .    .    .    .    .

HON. JUDGE:

Q. Did you observe it when you touched it?

A. The pole was broken, with splinters.

ATTORNEY BAUZÁ:

Q. How was the surface of the pole?

A. Decayed.

.    .    .    .    .    .    .    ."

Upon questioning by defendant:

"Q. Did you examine the pole on the outside?

A. Yes, sir.

Q. Did you find it blackish?

A. It looked decayed.

Q. How was it inside?

A. With splinters.

Q. Was it in good condition?

A. I did not notice.

Q. What color were the interior splinters?

A. Creosoted.

Q. That creosoted color, what is it like; look at that color up there, was it like that?

A. Yes, sir.

Q. Is that black?

A. Yes, sir.

Q. Was that the color of the wood?

A. Yes, sir.

Q. Is that why you believe that the outside was decayed?

A. The bark of the pole was loose.

Q. Is that why you believe that it was decayed?

A. Yes, sir.

Q. Was it not worm-eaten?

A. I did not notice.

. . . . . . . ."

[Plaintiff]

"Q. When you say that the pole was decayed, do you know what a decayed piece of wood looks like?

A. Yes, sir.

. . . . . . . .

Q. You say it was decayed?

A. Yes, sir."

Engineer Arístides Castro González testified for defendant on this same question on the condition of the pole. He said that he went to the place 10 months later and examined the base of the pole which was buried there since March 6, 1958.

"Q. Did you see there an object pointed out by this gentleman and which is photographed in Exhibit 6(c)?

A. Yes, sir.

Q. What was that?

A. The base of the creosoted pole.

Q. Did you examine it?

A. Yes, sir.

Q. What characteristics could be observed on that pole?

HON. JUDGE:

Q. The base is the stump, what remained of the fallen pole?

A. Yes, sir, the pole was creosoted; a preservative was used to prevent decay.

Q. How is that done?

A. That is a process whereby a pole, after it is taken out of the mill, is submitted to pressure; first, they remove all the air, they empty the cells and then they pour the creosote inside.

Q. What about the outside?

A. The outside is blacker because when they remove the pressure, air always remains inside the cells and it pushes the creosote upward.

. . . . . . . .

Q. What characteristics did the stump present?
A. It looked all right.

   .     .     .     .     .     .     .     .

Q. From the inspection which you made as expert and from your personal observation, was the stump in good condition?
A. It was in good condition; it was not worm-eaten and it was not decayed.
Q. What did it look like?
A. The stump still had enough creosote in the wood and it had all the inside creosote.
Q. Did it look quite new?
A. It was quite new.

   .     .     .     .     .     .     .     .

Q. Was it firmly buried in the ground?
A. Yes, sir."
[Judging by the fibers, the witness concluded that the pole had fallen as a result of tension or lateral force which had struck it.]

Tomás Figueroa López, defendant's employee and general supervisor of special cases, testified that he was working at that time in the districts of Fajardo and Humacao; that he had occasion to inspect the pole and the stump on July 12, 1957, when his superior ordered him "to inspect something because someone had reported that a cable was lying on the ground and that someone had knocked down the pole".

"Q. Did you examine the trunk?
A. Yes, sir.
Q. In what condition was the trunk?
A. Apparently it received an impact and it broke about 18 inches from the ground and was in shreds.
Q. Was the trunk decayed?
A. No, sir.
Q. Was it worm-eaten?
A. No, sir.

   .     .     .     .     .     .     .     .

Q. In what condition was it?

A. It was well preserved because prior thereto I had passed by that place and the poles in that section which were decayed, the cyclone tore down over 125 of them.

Q. What cyclone?

A. Santa Clara.

[The court is urged to take judicial notice that Santa Clara cyclone occurred in September 1956.]

It isolated that section completely.

Q. Did it tear down poles?

A. It tore down those which were decayed.

HON. JUDGE:

Q. Why did they decay?

A. They decayed as a result of the weather.

Q. They decay even though they are creosoted?

A. Yes, sir.

Q. Those which you say were decayed, were they creosoted?

A. Yes, sir. They were very old.

Q. What average?

A. The square ones were discontinued about 30 to 35 years ago.

Q. The one which broke, how was it?

A. Round.

Q. How old was it?

A. From five to six years in use, it was a No. 7 pole, entirely black, and it was repaired as is done in all of those of the plant.

Q. Didn't Santa Clara cyclone affect the pole?

A. No, sir, it stood quite well and after the cyclone we had to send two crews to put up the poles."

Commonwealth policeman Ernesto Colón testified that he examined the pole that night, that it was black on the outside and the color of wood in the inside, and that it was not decayed. Like plaintiffs' witnesses, he stated that the pole had not been struck.

In the light of the evidence in the record of both parties—according to its weighing—the trial court did not conclude that the falling of the pole was the result of the action or impact of an outside agent, whether the vehicle involved or

any other extraneous agent. We must not consider that the fact remained implied by the judgment relieving defendant from liability, since there was evidence to show conclusively that there was no such extraneous intervention. In view of those circumstances, the determination whether or not there was negligence on the part of defendant is not therefore affected by the fact of whether or not it had knowledge of the breaking and falling of the pole sufficiently in advance to correct the situation.

Nor may it be concluded from the record that the pole could have broken down or was broken as a result of the impact of the automobile when it became entangled in the lying wire. This must be so because from the undisputed evidence it appears conclusively that the wire crossed the road at an altitude of about 18 feet, perpendicular at the sides, the ends of which were attached to the upper part of two poles, one on each side of the road. When the accident occurred the wire extended in a sloping line (like a hypotenuse), the lower part toward the right-hand side along which the vehicle was traveling, the ends of which were still attached at both poles. The conclusion a fortiori is that when the vehicle suddenly approached the fallen cable, at a slightly visible closed curve, the right-hand side telephone pole was on the ground. The foregoing does not imply that there would be no liability if one of the ends of the wire had been loose.

■■ Assuming that under the circumstances in which the accident occurred in this case plaintiffs were bound to prove the specific cause of the falling, in the absence of intervention of an extraneous agent, of an act of force majeure or unforeseeable event, and of an installation defect, the only rational and logical inference to be drawn from the evidence as a whole is that the pole broke as a result of its own condition, perhaps such as that described by plaintiffs' evidence. In the absence of these factors, the fact itself of the breakage of the pole tends to belie any inference that

it was in good condition. The question is not the credibility of any one witness, but the more rational balance of the evidence as a whole, *Sanabria* v. *Heirs of González*, 82 P.R.R. 851, 858 (1961), the balance of the possibility of an act as against certain factors against its probability.

Notwithstanding the foregoing, the burden of proof was not with plaintiffs to show the specific cause of the breakage. Under those circumstances, the case is typical for the application of the maxim *res ipsa loquitur* which once again has been fully applied by our brother Mr. Justice Hernández Matos in *Community Partnership* v. *Presbyterian Hospital, ante,* p. 379, which we deem reproduced in its entirety to the situation under consideration. See, also, cases and authorities therein cited. In *López* v. *García,* 86 P.R.R. 666 (1962), we stated as follows the contents of that doctrine reduced to its minimum expression: "The manner in which the accident occurred rules out every possibility of applying this doctrine to the case, which governs in situations in which an accident ordinarily causing damage should not occur, and the agent causing the same is under the control and supervision of a person, in which case the doctrine grants to the injured party as starting point such person's negligence." (Citations.) Such initial presumption of fault or negligence, under present certain circumstances, is demanded and required by the social duty not to cause damage to another—*alterum non laedere*—and the obligation to repair the damage so done. Section 1802 of the Civil Code, 1930 ed. *Cf. Ramos* v. *Carlo,* 85 P.R.R. 337 (1962), and cases therein cited. Ordinarily, the poles and wires of a public service company installed on public or private property should not fall or cause damage, except in the case of unforeseeable force majeure—"No one shall be liable for events which could not be foreseen, or which having been foreseen were inevitable"—§ 1058 of the Civil Code, 1930 ed., or due to an extraneous intervening cause imputable to a third person.

The duty not to cause damage requires companies using public or private property for installing their appliances to exercise the maximum degree of inspection and continuous vigilance of its installations.[1]

■ The record does not disclose that defendant herein controverted properly the presumption of fault or negligence attributable to it by the breaking and fall of the pole under the described circumstances. Its evidence fails to establish that it did its duty to inspect and survey as it was bound to do, thereby preventing the occurrence of an act which ordinarily should not have occurred. Contrary to the criterion of the trial court, our opinion is that defendant should be liable

---

[1] As stated by Castán, *Derecho Civil Español, Común y Foral*, Vol. 3, p. 146 (8th ed. 1954) : "The essence of the fault lies in the lack of diligence and foreseeability of the wrongdoer."

Barassi, cited by Santa María, *Comentarios al Código Civil*, Vol. 2, p. 947 (1956), speaks of the general duty of correctness and prudence imposed by the general necessity of orderly social living together toward the other citizens, and declares the act illicit in the extracontractual sense whenever it violates the general duties of social correctness or of correct ·conduct, which duties are not prescribed in the codes but which represent the logical minimum supposition of the order of social life, which concepts we also cited in *Ramos* v. *Carlo, supra.*

See *Brakensiek* v. *Nickles*, 227 S.W.2d 948, 950; and the extensive summary of decisions on the matter in the notes following this case in 28 N.C.C.A. (N.S.) 281–437: *Falling Electric Wires. Cf. Friendship Telephone Co.* v. *Russom*, 309 S.W.2d 416 (Tenn.) ; *Union Gas & Electric Co.* v. *Waldsmith*, 166 N.E. 588 (Ohio) ; *Nichols* v. *City of Minneapolis*, 23 N.W. 868, 869 *in fine* (Minn.).

In view of the hazards of the overwhelming machinism of modern society, it becomes each time more irreconcilable in this type of activities the idea that a damage suffered will not be compensated in the absence of an Act of God or of fault of the aggrieved party himself or imputable to a third person. *Cf. Green* v. *General Petroleum Corporation*, 270 Pac. 952, 954-55 (Cal.) ; Prosser, Strict Liability 315-49 (2d ed. 1955).

Hence the tendency both in the Anglo-Saxon and in the Latin doctrine, the product of the modern economic industrial phenomenon, toward objective liability in the typical case which to a certain extent seems to be only a more radical and advanced version of *res ipsa*. Yet, it ought to be clear that the decision of the case at bar is based on a rationally established negligence, or a rationally inferred negligence under that maxim, not controverted by defendant.

for the damages caused in this accident. We shall render the judgment which it should have entered.

In accordance with the uncontroverted evidence in the record, there shall be awarded:

(1) To plaintiff Pascual Márquez, the sum of $1,300 for all kinds of damages claimed, including $500 for total loss of the vehicle;

(2) To plaintiff Lydia Agosto López, who suffered the fracture of the left perone, $6,500 including lucrum cessans;

(3) To minor plaintiff Lydia Esther Rivera, $2,500;

(4) To minor Blanca Iris Rivera, $1,000;

(5) To minor Ada Elba Agosto, $1,000;

(6) To plaintiff Pascuala López, mother of Lydia and Ada Elba Agosto, $1,000;

(7) To plaintiffs Ramón Rivera and María de Jesús Delgado, parents (unmarried) of minors Lydia Esther and Blanca Iris Rivera, who lived in the company of their daughters, $500 to each.

The judgment rendered by the Superior Court will be reversed and another rendered instead in the terms stated. The costs of this proceeding, including those of this appeal, and $1,500 for attorney's fees in the trial court, are awarded to defendant.